# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**VERSUS**

**ARON WINTER MOSQUERA-CASTRO**

CR. NO. 17-13-JWD-RLB-4

JUDGE JOHN W. deGRAVELLES

## RULING AND ORDER

Before the Court is a Motion to Suppress filed by Defendant Aron Winter Mosquera-Castro ("Defendant"). ("Motion," Doc. 292). The Government opposes the Motion. (Doc. 353). A Reply was not filed. A hearing on the Motion occurred on May 17, 2018: Iberville Parish Sheriff's Deputy and Drug Enforcement Agency ("DEA") Task Force Officer Timothy Fabre and Iberville Parish Sheriff's Deputy Zane Hebert testified for the Government, and the Defendant presented no witnesses. The parties also filed post-hearing briefs. (Docs. 388, 389).

For the reasons discussed below, the Motion is denied.

## I. FACTUAL BACKGROUND[1]

This case concerns the activities of an alleged drug trafficking organization operating in East Baton Rouge and Ascension Parishes. In February and March 2016, Fabre intercepted telephone communications among Jason Muse, Defendant, and others concerning the trafficking of drugs. According to Fabre, during the communications, Defendant would occasionally act as an interpreter for others, albeit with some "slight" difficulties. Based on those communications and other surveillance, officers learned that Defendant would arrive in Baton Rouge to conduct a drug transaction on or about March 27, 2016.

---

[1] Because of the rapidly approaching trial date in this case, the parties graciously agreed to prepare post-hearing briefs without the aid of a transcript. The Court has reviewed the audio recording of the testimony presented, and its description of the facts is drawn from this testimony.

1

Around 4 or 5 P.M. on March 27, 2016, Fabre contacted Hebert to request that he wait on I-10 "in between West Baton Rouge and Iberville Parish" in his marked patrol car because officers were conducting surveillance and Hebert might need to conduct a traffic stop. Fabre provided no additional information about Defendant at that time. Hebert contacted his partner, Deputy Mark Cooper, and asked him to wait there in a separate vehicle.

According to Hebert, he got into position around mile marker 145 on I-10 westbound sometime between 5 and 6 P.M., at which point he contacted Fabre. Fabre informed Hebert that officers were engaged in physical surveillance of Defendant (although Fabre and Hebert both stated that Fabre did not provide Defendant's name at that time), that Defendant was engaging in a drug transaction, and that the proceeds of that transaction would likely return to Texas with Defendant. Fabre advised Hebert not to stop any other vehicles and that his "sole purpose" was to stop Defendant, and Hebert in fact stopped no other vehicles that evening. Fabre gave Hebert the vehicle's license plate number and description and advised that he would contact Hebert again later. The two were in contact "periodically" while surveillance was ongoing, and Hebert "loosely" monitored the surveillance unfolding via High Intensity Drug Trafficking Area ("HIDTA") radio transmissions. On cross-examination, Hebert confirmed that he waited alongside I-10 for several hours without fully investigating Defendant's criminal background, although he knew that the vehicle that he was waiting for was registered to Defendant. He stated, however, that he did not know Defendant would be driving the vehicle. He also testified that the equipment and software in his vehicle, unlike that available to his dispatcher, sometimes gives incomplete information when performing certain criminal background checks.

The surveillance team observed the meeting between Defendant and Muse, after which Defendant returned to a motel where he had been staying. Defendant stayed there briefly and

picked up a passenger, and the two stopped at a gas station briefly before getting on I-10 westbound.

Once officers confirmed that Defendant was headed back toward Texas, Fabre contacted Hebert again. Fabre stated that this contact took place "somewhere around" 11:40 P.M., while Hebert testified that it took place "approximately 11:15 to 11:30-ish or maybe a little before." Fabre told Hebert that they were heading "in his direction" and that Hebert needed to closely monitor the HIDTA radio frequencies. Fabre also said that, as they reached Hebert's location, Fabre would be two vehicles in front of Defendant. Fabre told Hebert that the drug transaction had occurred and that the vehicle to be stopped would likely contain proceeds of a drug transaction. Fabre instructed Hebert to "develop his own PC" and "wait for a traffic stop" before stopping the vehicle. Fabre testified that he did not wish to compromise the integrity of the drug investigation by making an arrest based on the facts underlying that investigation.

As Fabre and Defendant passed Hebert, there was a tractor trailer between Fabre and Defendant, and Fabre was unable to observe Defendant's driving at that time. Fabre testified that he passed Hebert around mile marker 145. Fabre stated that, because traffic was light, the trip from the gas station to Hebert's location took about fifteen minutes.

Hebert testified that he got onto I-10 and began to follow directly behind Defendant's car. According to Hebert, Defendant was traveling in the left lane at that time and stayed there the whole time that Hebert was following him. Hebert also stated that he observed Defendant cross the white fog line "several times" during that period. Hebert testified that he followed Defendant for "approximately four miles" before initiating a traffic stop.

The stop occurred shortly after midnight, around 12:02 A.M., although Fabre stated that he did not recall the exact time. Hebert turned on his emergency lights to initiate the stop, and

3

his dash cam was activated at the same time. As the dash cam video begins, Defendant is in the left lane behind a tractor trailer, and there is also a tractor trailer in the right lane just ahead of both of them. During cross-examination, Hebert suggested that the tractor trailer on the right was overtaking the one on the left, and it did not look otherwise to him, although he could not definitively say which tractor trailer was going faster. Hebert also confirmed that Defendant did not "tap" a fog line in the video. However, Hebert testified that, in the "four miles or so" that Hebert had been following Defendant before the video began, Defendant was in the left lane with vehicles passing him in the right lane, and he had not yet reached the tractor trailer that he was traveling behind in the video. Hebert also testified that, during those four miles, Defendant crossed the fog line. Hebert testified that traffic was traveling at about 65 or 70 miles per hour.

During the initial minutes of the stop, Hebert explained to Defendant the traffic violations that he had allegedly committed, obtained Defendant's identification, and asked for the vehicle's registration and insurance paperwork. Hebert also talked to Defendant's passenger after being told that the vehicle's documentation was in the car, where she was sitting. The vehicle's documentation ultimately could not be located, although some expired documentation was found. Hebert questioned Defendant and his passenger about their activities and travel itinerary. Defendant stated that he and his girlfriend were traveling from Orlando in connection with a Disney World vacation.

After this initial contact, Hebert "called in" Defendant's license number and the vehicle's license plate number to his dispatcher. He also contacted Fabre and said that he was going to ask for consent to search. Fabre told Hebert that, if a search occurred, it should "focus on the dash," as prior surveillance indicated that the proceeds of the transaction might be located there. Hebert also contacted Cooper, who was not present, as it is standard procedure for two officers to be

4

present for a search.  Hebert testified that, while the license check was pending, Defendant was neither in custody nor free to leave.

Hebert then continued talking to Defendant.  After asking a few more questions about Defendant's itinerary, Hebert said, "while we're waiting on your information to come back, along this interstate we got a big problem with people transporting illegal things inside their vehicles."  Hebert then asked how much money Defendant was traveling with, and Defendant advised that there was about $3,000 in the seat pocket of the vehicle associated with the Disney World vacation.  Defendant confirmed in response to a question that he did not have any "large amounts" of currency, *i.e.*, over $10,000.  Hebert asked, "can I search your vehicle," and Defendant said, "yeah, sure."  According to Hebert, he did not raise his voice, threaten Defendant, or make promises to him in connection with this request, and Defendant said "yes" without hesitation, appearing to understand the question.  Hebert also did not use his handcuffs or weapon in connection with the request or during the stop.  At the time when Hebert requested consent, Hebert still had not received a response regarding his request for a license check.

After Defendant consented, Hebert patted down Defendant.  Hebert also attempted to inform the passenger that Defendant had consented to a search and asked whether there was anything of hers that she did not want searched, but he decided to have Defendant "explain it to her" in Spanish because she did not speak English very well.

The search resulted in a seizure of over $40,000 located in the car's dashboard.  Hebert testified that Defendant was cooperative and responsive throughout the encounter but sometimes exhibited physical signs of nervousness (which were often not visible on the dash cam video).  He also testified that, during the stop, he and Defendant seemed to have no trouble understanding each other.  Defendant was not issued a ticket for a traffic infraction as a result of the stop.

According to Fabre, following the stop and seizure of the money, Defendant contacted Muse to inform him that the police had taken the money and they were in "big trouble" with their supplier.

Fabre also testified that he was present during a later stop of Defendant and spoke directly with Defendant for an hour or more during that stop. Fabre said that he encountered no difficulties communicating with Defendant in English during that stop, and Defendant never said that he could not understand Fabre.

## II. GENERAL LEGAL STANDARDS

### a. The Fourth Amendment

Defendant seeks suppression on Fourth Amendment grounds. The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 653–654 (1979)).

"While in general, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the [G]overnment." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). Particularly, the burden shifts to the Government when a defendant shows that he was subject to search without a warrant. *Id.*; *see also United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (warrantless searches and seizures are "per se unreasonable unless they fall within a few narrowly defined exceptions").

Where, as here, a defendant was subject to a warrantless search, the Government bears the burden of proving the legality of the warrantless search by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

### b. *Terry* Stops

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000), *abrogated in part on other grounds by United States v. Pack*, 612 F.3d 341 (5th Cir. 2010). The Fifth Circuit analyzes the constitutionality of traffic stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Berry*, 664 F. App'x 413, 418 (5th Cir. 2016) (per curiam).

*Terry* articulated a two-part test, which asks: (1) whether the stop was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20).

### c. Consent to Search

Consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973); *United States v. Jenkins,* 46 F.3d 447, 451 (5th Cir. 1995). In order to demonstrate valid consent, the government must establish by a preponderance of evidence that the consent was voluntary, *Jenkins,* 46 F.3d at 451; *United States v. Hurtado,* 905 F.2d 74, 76 (5th Cir. 1990) (en banc).

Additionally, even if a detention is initially or ultimately becomes constitutionally impermissible, a defendant's consent can, but does not necessarily, operate to "dissipate the taint of a prior Fourth Amendment violation." *Jones,* 234 F.3d at 242. As the Fifth Circuit has stated:

> When we analyze consent given after an unconstitutional detention, a two-pronged inquiry is applied: (1) whether the consent was voluntarily and freely given; and (2) whether the consent was an independent act of free will. *Jones,* 234 F.3d at 242. "The first prong focuses on coercion, the second on causal connection with the constitutional violation." *United States v. Chavez–Villarreal,* 3 F.3d 124, 127 (5th Cir. 1993). We have made clear that affirmance for the Government on such consent as here is appropriate only if *both* questions are answered favorable to it: "Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will." *Id.* at 127–28. Furthermore, the Government "has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Jones,* 234 F.3d at 242 (internal quotation marks omitted).

*United States v. Macias*, 658 F.3d 509, 522–23 (5th Cir. 2011).

The Fifth Circuit has set forth the following non-exclusive factors to be used in determining whether consent is voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014) (citation omitted). "No single factor is dispositive," *id.*, and that the issue of whether consent was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The Government's burden cannot be discharged by showing "no more than acquiescence to a claim of lawful authority." *Rounds*, 749 F.3d at 338 (citing *United States v. Jenkins,* 46 F.3d 447, 451 (5th Cir. 1995)).

With respect to whether consent is an independent act of free will, courts in this circuit consider: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *United*

*States v. Ansourian*, 487 F. App'x 155, 158 (5th Cir. 2012) (citing *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006) (citations omitted)).

### III.  THE PARTIES' ARGUMENTS

Initially, Defendant's Motion was directed in significant part at whether Hebert's actions following the stop were reasonably related to those giving rise to the stop or justified by reasonable suspicion of additional criminal activity.  (Doc. 292-1 at 5-10).  However, Defendant has abandoned that line of attack.  (Doc. 389 at 8).

Defendant now contends principally that the stop was not justified at its inception, as he denies that he committed the traffic violations that Hebert allegedly observed.  (*Id.* at 3-8; *see also* Doc. 292-1 at 5).  He first argues that, although Louisiana law prohibits traveling in the left lane without overtaking or passing, the dash cam video shows that Defendant and the tractor trailer in front of him were "catching up to" and passing vehicles in the right lane.  (Doc. 389 at 4).

In support of his argument that Hebert is not to be believed, Defendant focuses particularly on alleged inconsistencies in the timeline leading to the stop.  Defendant asserts that: (1) Fabre reported contacting Hebert concerning Defendant's departure at 11:40 P.M., although he "wasn't exactly sure," and that travel "from the [motel] to the Gross Tete exit where the stop took place" took fifteen minutes, (*id.* at 6); (2) "Hebert said that he received notice that [Defendant] was on the way as early as 11:15[,]" (*id.* at 6); and (3) according to the DEA's report concerning the stop, Defendant left the gas station "[a]t approximately, 11:40 p.m."  (Doc. 389-3 at 2).

Defendant contends that, in light of the DEA's report and Fabre's statement, Hebert's statement about when he was informed of Defendant's departure is clearly untrue.  (Doc. 389 at

9

6).  Defendant further argues that Hebert lied because, under the facts as they must actually exist, Hebert could not have followed Defendant for "any length of time."  (*Id.* at 6).  That is, according to Google Maps, the distance between the gas station and Grosse Tete, where Hebert's report says the stop occurred, is 24.1 miles, (Doc. 389-4 at 1), and it would have taken between twenty and twenty-five minutes to travel "to Iberville Parish from the [motel]."  (Doc. 389 at 6).

Relatedly, Defendant argues that, according to a road sign visible on Google Street View, Iberville Parish begins between mile marker 142 and 141 on I-10 westbound.  (*Id.* at 7; *see also* Doc. 389-5, Doc. 389-6, Doc. 389-7).  Thus, if Hebert began following Defendant "once [Fabre] and [Defendant's] vehicles entered Iberville Parish," and the stop occurred at about mile marker 141 on I-10 westbound, Hebert had been following Defendant for less than a mile when the stop occurred.  (Doc. 389 at 7).

Defendant also challenges Hebert's credibility on other grounds.  Particularly: (1) his testimony that he waited for hours beside I-10 without running Defendant's name through any "interstate identification system" strains credulity, (*id.* at 5-6); (2) Hebert's report concerning the stop does not mention inter-agency cooperation, indicating his "willingness to engage in deception," and he did not adequately explain how failing to mention the cooperation would protect the integrity of an ongoing investigation, (*id.* at 7); and (3) Hebert seized over $40,000 "for [Hebert and Fabre's] parish" via forfeiture, (*id.*).  Throughout Defendant's post-hearing brief, he emphasizes that Hebert was unconcerned with traffic violations but instead pulled Defendant over because he believed Defendant to be a narcotics trafficker.  (*Id.* at 4-5, 8).  Defendant also argues that his alleged consent to search was insufficient to dissipate the taint of the unlawful stop.  (*Id.* at 9; *see also* Doc. 292-1 at 10-14).

With respect to the issues still present in this case, the Government argues first, that Hebert had objectively reasonable suspicion that Defendant had committed traffic violations and second, that Defendant's consent was freely and voluntarily given. (Doc. 353 at 4-5, 7-8; Doc. 388 at 4-5, 7-9).

## IV. DISCUSSION

### a. Justification at Inception

As set forth *supra*, the parties dispute whether, under the *Terry* framework, the stop was justified at its inception. In *United States v. Cole*, the Fifth Circuit discussed the circumstances under which a stop is justified at its inception:

> A police officer may stop a vehicle if he has probable cause to believe a traffic violation has occurred. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). . . . The rule established by the Supreme Court in *Whren* allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop. Because of this allowance, if courts permitted officers to justify a stop based on their subjective belief that traffic laws have been violated, when no violation has in fact occurred, the potential for abuse of traffic stops as pretext for effecting stops for other purposes seems boundless and the costs to privacy rights excessive. Thus, instead of allowing an officer to justify a traffic stop based on the officer's subjective belief that a violation occurred, courts require that the legal justification for a traffic stop be objectively grounded.

444 F.3d 688, 689 (5th Cir. 2008) (some citations and internal quotation marks omitted).

Preliminarily, the dash cam video does not much inform the disposition of this issue. Hebert testified that the dash cam was activated when he activated his emergency lights, *i.e.*, when he had already decided to pull Defendant over and as the stop was beginning. Therefore, this portion of the video is only relevant for what its contents suggest might have come immediately before, and it is impossible to tell from these few seconds of video whether traffic in the left lane was overtaking traffic in the right lane. *See* La. Rev. Stat. § 32:71(B)(1)(a).

11

However, having observed Hebert's demeanor and testimony during the hearing and reviewed it in light of the other evidence in this case, the Court finds him credible and believes that Defendant committed traffic violations while Hebert was following him. Defendant generally does not dispute that the conduct Hebert claims to have observed violated Louisiana law, (*see* Doc. 389 at 4): he argues that the Court should disbelieve Hebert. Defendant's arguments are unconvincing.

The problem with Defendant's argument concerning the timeline is that it does not directly address the testimony from the suppression hearing. Both Fabre and Hebert testified that Hebert waited near mile marker 145, and Fabre testified that the trip between the gas station and Hebert's location took fifteen minutes. Even if the Court takes judicial notice of travel distances expressed on Google Maps and the contents of photos on Google Street View, *see Magee v. Glacier Water Servs., Inc.*, 2017 WL 396287, at *3 n.29 (E.D. La. Jan. 30, 2017), the testimony at the hearing did not claim that Hebert began following Defendant exactly at the Iberville Parish line (between mile markers 141 and 142) or that the trip from the gas station to the location of the stop (roughly mile marker 141) took fifteen minutes. The Court also notes that Hebert's testimony that he was informed of Defendant's departure "approximately 11:15 to 11:30-ish or maybe a little before" reads more as a good-faith estimation than a "create[d] . . . fabrication," (Doc. 389 at 6), intended to deceive.

Defendant's other arguments are similarly unavailing. The Court finds unremarkable Hebert's suggestion that he waited beside I-10 for hours without fully investigating Defendant's background: as Hebert testified and common sense suggests, a vehicle involved in a drug transaction is frequently not driven by the person to whom it is registered. *See United States v. Bams*, 858 F.3d 937, 944 (5th Cir.), *cert. denied,* 138 S. Ct. 531, 199 L. Ed. 2d 406 (2017)

(officer had not unreasonably prolonged detention during *Terry* stop; additional reasonable suspicion arose where officer saw single key in ignition during stop and explained at a hearing that "drug traffickers often drive third-party vehicles" such that they often have only a single key). Hebert also credibly suggested that, had he performed a check himself, without calling it in to his dispatcher, it might not have revealed Defendant's complete background anyway.

The Court similarly finds unremarkable the omission of the drug trafficking investigation from Hebert's report. Defendant suggests that this shows Hebert's "willingness to engage in deception," (Doc. 389 at 7), but there has been no credible suggestion that Hebert has attempted to conceal the existence of the investigation from anyone other than the subjects of the investigation such that it might affect his credibility before this Court. Even if there was little to be gained from omitting the investigation from the report, there was even less to be gained from including it. *See also United States v. Adams*, 2010 WL 3504072, at *14 (E.D. Mich. Mar. 10, 2010), *report and recommendation adopted*, 2010 WL 3504065 (E.D. Mich. Sept. 2, 2010) ("Defendant appears to argue that the troopers are not credible because the police report relating to this incident omitted the DEA's request to stop the vehicle, but that information was omitted at the request of the DEA so as not to compromise the ongoing investigation and, therefore, the police report does not lessen the troopers' credibility."). The Court also does not find, given the testimony and evidence in this case, that Hebert's credibility is meaningfully undermined by the fact that the funds seized were ultimately forfeited to Iberville Parish.

For the foregoing reasons, the Government has shown by a preponderance of the evidence that the stop was justified at its inception, satisfying the first prong of *Terry*. That a traffic violation was not the "real reason" for the stop is immaterial. *Cole*, 444 F.3d at 689. Defendant does not contest the second prong of the *Terry* analysis. Thus, the only remaining

consideration is whether Defendant voluntarily consented to the search; the Government need not also show that the consent was an "independent act of free will." *United States v. Khanalizadeh*, 493 F.3d 479, 484 (5th Cir. 2007) ("[T]he district court did not err by failing to consider whether Khanalizadeh's consent was an independent act of free will, given that Washington's initial traffic stop was constitutional.").

### b. Consent to Search

As discussed *supra*, the Fifth Circuit has set forth the following non-exclusive six-factors to be used in determining whether consent is voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Rounds*, 749 F.3d at 338 (citation omitted). "No single factor is dispositive," *id.*, and that the issue of whether consent was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The Government's burden cannot be discharged by showing "no more than acquiescence to a claim of lawful authority." *Rounds*, 749 F.3d at 338 (citing *Jenkins,* 46 F.3d at 451).

#### i. Voluntariness of Custodial Status

The parties agree that, when Defendant consented to the search, he was not free to go or to terminate the encounter. (Doc. 292-1 at 11; Doc. 353 at 7).

#### ii. Coercive Police Procedures

The parties disagree about the presence of coercive police procedures. Defendant alleges that Hebert used "rapid fire and intimidating questions," (Doc. 292-1 at 12), while the

Government highlights the lack of procedures like "handcuffs and multiple officers" or "threats, yelling, badgering, or promises" by Hebert. (Doc. 353 at 7).

Having reviewed the dash cam video, the Court disagrees with Defendant's characterization of Hebert's questions as "rapid fire and intimidating," and there is no evidence of other coercive procedures. The Court also finds distinguishable *United States v. Robertson*, 16 F. Supp. 3d 740, 748 (M.D. La. 2014), *aff'd*, 614 F. App'x 748 (5th Cir. 2015), upon which Defendant relies. In *Robertson*, a different section of this Court ruled that a request to search was coercive where it was prefaced by the phrase "before you go." *Id.* at 748. According to *Robertson*, this phrasing suggested that Defendant's ability to leave was conditioned on acquiescence to the search. *Id.* Even if *Robertson* were persuasive in general, here Hebert's discussion of the search was prefaced by "while we're waiting on your information to come back." That is, Hebert suggested that Defendant's continued detention was the result of waiting for completion of an ongoing license check and did not suggest that the termination of the stop was conditioned on agreeing to a search.

### iii. Defendant's Cooperation with Police

With respect to Defendant's cooperation, Defendant highlights his failure to "tell the officers where they would find contraband or provide any other details that would assist law enforcement[,]" (Doc. 292-1 at 12), while the Government emphasizes Defendant's "demeanor" and "immediate[]" consent to search "without hesitation." (Doc. 353 at 7). The Court agrees with both parties: Defendant provided Hebert with no affirmative assistance in conducting the search but also did not appear reluctant or hesitant to consent.

### iv. Defendant's Awareness of the Right to Refuse

As Defendant correctly observes, there is no evidence that Hebert informed Defendant of his right to refuse consent. (Doc. 292-1 at 12). The Fifth Circuit has confirmed in an unpublished opinion the importance of informing a suspect of his right to refuse where consent is "ambiguous" or where consent is obtained "while the officer [is] still in possession of a defendant's personal effects," *United States v. Zavala*, 459 F. App'x 429, 434 (5th Cir. 2012), but has also emphasized that "[p]roof of knowledge of the right to refuse consent is not required to show voluntariness." *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir. 1988); *see also United States v. Burcham*, 2016 WL 5723663, at *5 (M.D. La. Sept. 30, 2016), *aff'd*, 707 F. App'x 820 (5th Cir. 2018) (consent voluntary notwithstanding the fact that, under *Zavala*, this factor weighed against the Government because officer had possession of the defendant's license and registration when he asked for consent and had not informed defendant of his right to refuse; in affirming the decision, the Fifth Circuit reiterated that this factor "is only one factor to consider in the inquiry and is not a perquisite to effective consent").

### v. Defendant's Education and Intelligence

The parties also address Defendant's "education and intelligence." Defendant notes that he is a "native Spanish speaker," although he understands English "at times," and that he has a "very limited criminal record." (Doc. 292-1 at 12-13). The Government argues that a Spanish-speaking defendant's consent to a request to search made in English is voluntary where there is "sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation[.]" (Doc. 353 at 8 (citing *United States v. Alvarado*, 898 F.2d 987, 991 (5th Cir. 1990)).

Based on the dash cam video and the testimony at the hearing, the Court concludes that Defendant's English proficiency was no obstacle to his voluntary consent in this case (although the Court notes that Defendant received the assistance of an interpreter during the suppression hearing). Fabre testified that, during telephone communications, Defendant occasionally acted as an interpreter with only "slight" difficulties and also that, in a subsequent stop, Fabre spoke with Defendant and encountered no difficulties in communicating with him in English. Hebert's testimony and the dash cam video further reveal that Defendant had an adequate understanding of English to "fully comprehend the situation." *Alvarado*, 898 F.2d at 991; *cf. United States v. Hernandez*, 2015 WL 867930, at *15 (M.D. La. Feb. 27, 2015) (Spanish-speaking defendant's waiver of *Miranda* rights was valid because she was advised of her rights in a language she "sufficiently underst[ood]," notwithstanding that Spanish might be "the language she prefer[red] or [was] more comfortable with"). The Court further concludes that Defendant's criminal history has little weight in either direction.

### vi. Defendant's Belief That Evidence Would Be Seized

The parties dispute whether Defendant believed that no incriminating evidence would be found. Defendant states that he was "aware of the money seized from his vehicle," (Doc. 292-1 at 13), while the Government states that the money was discovered in a hidden compartment behind the radio which required the removal of a portion of the dashboard, making it unlikely that Defendant expected the contraband to be discovered, (Doc. 353 at 8).

The Court agrees with the Government. The relevant question is not whether Defendant was aware of the existence of the money, as Defendant suggests, but rather whether he believed that it would be found as the result of a search. The money was located in a hidden compartment that required removing part of the dashboard to access, suggesting that Defendant freely

consented because he believed that no contraband would be found. *See United States v. Three Hundred Sixty-Nine Thousand Nine Hundred Eighty Dollars ($369,980) in U.S. Currency*, 214 F. App'x 432, 434 (5th Cir. 2007) (consent voluntary where, *inter alia*, "Garcia believed that no incriminating evidence would be found, as the money in question was concealed in a compartment located under/behind the back seat").

### vii. Overall Consent to Search

Based on the foregoing non-exclusive factors, under the totality of the circumstances, the Court concludes that Defendant's consent to search was voluntarily given and was not merely "acquiescence to a claim of lawful authority." *Rounds*, 749 F.3d at 338. It is true that, at the time of the consent, Defendant was not free to go, he provided no affirmative assistance in conducting the search, and he was not expressly informed of his right to refuse consent. However, Hebert did not use coercive police procedures in obtaining consent, Defendant was cooperative throughout the encounter and consented immediately and without hesitation to a search when asked, Defendant's education and intelligence do not suggest an inability to consent to a search, and Defendant likely believed that the search would not reveal the money hidden in the dashboard. Therefore, Defendant's consent was voluntary.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress, (Doc. 292), is DENIED.

Signed in Baton Rouge, Louisiana, on <u>June 21, 2018</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**