**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA                    CRIMINAL

VERSUS                                                        NO. 17-13-JWD-RLB

ARON WINTER MOSQUERA-CASTRO

## RULING AND ORDER

  This matter is before the Court on a *Motion to Suppress Evidence and Statements* ("*Motion to Suppress*") filed by Defendant, Aron Winter Mosquera-Castro. (Doc. 508.) In opposition, the Government filed *United States' Response in Opposition to Defendant's Motion to Suppress Evidence and Statements*. (Doc. 543.) Defendant filed a supplemental *Pretrial Memorandum in Support of Franks Hearing in Regards to Defendant's Motion to Suppress Evidence and Statements* ("*Supplemental Brief*"). (Doc. 596.) In response, the Government filed *United States' Response to Pretrial Memorandum in Support of Franks Hearing in Regards to Defendant's Motion to Suppress Evidence and Statements*. (Doc. 597.) Defendant filed a reply, (Doc. 607) and the Government a surreply (Doc. 613.) The Court held an evidentiary hearing on the *Motion to Suppress* on September 30, 2019.  Following the hearing, Defendant filed a *Post-Hearing Memorandum in Support of Motion to Suppress*. (Doc. 660.) In response, the Government filed *United States' Response to Defendant's Post-Hearing Memorandum in Support of Motion to Suppress*. (Doc. 663.) Having considered the facts, the arguments of the parties and the law, and for the reasons set forth below the Court will DENY the *Motion to Suppress*.

<u>FACTUAL BACKGROUND</u>

    *a. Initial investigation into the drug-trafficking organization*

In September 2015, the Drug Enforcement Administration ("DEA") initiated an investigation based on a tip from a confidential source that Jason Muse was running a large-scale drug-trafficking organization in Ascension Parish. (Doc. 508-1 at 1.) The source revealed the location of Jason Muse's residence and other properties and stated that he owned a restaurant, MJ's Chicken and Waffles. (*Id.*). The source also explained that Jason Muse and his wife, Marshall Muse, regularly traveled to Florida to pick up large amounts of cocaine. (*Id.* at 2.)

DEA agents began coordinating controlled buys with Jason Muse and Darwin Elphage. (*Id.* at 2.) They recorded the source's text messages and phone calls with Jason Muse and Darwin Elphage, and recorded conversations with a body recorder. (*Id.*). Between December 2015 and January 2016, agents met additional confidential sources who corroborated that Jason Muse sold heroin and cocaine in Ascension Parish and revealed other members of the organization, including Herman Jimmerson III and Kevin Boudreaux. (*Id.*). When Darwin Elphage was incarcerated between December 2015 and January 2016, Ascension Parish sheriff's deputies recorded approximately 20 phone calls between he and Jason Muse, which provided "insight into the organization's methods regarding storage and transport of drugs and money." (*Id.* at 3.)

In November 2015, agents secured warrants for pen registers and trap-and-trace[1] monitoring. (*Id.*). Agents also conducted telephone toll analysis to monitor the number of communications between Jason Muse, Darwin Elphage, Herman Jimmerson III, Chester Muse, and Ronald Davis. (*Id.*). A different confidential source identified Santos Mosquera-Candelo as the source of Jason Muse's heroin supply. (Doc. 658 at 13:21-15:1; and 64:16-65:22.) Santos

---

[1] Pen registers record phone numbers dialed for outgoing phone calls, while trap-and-trace devices capture numbers on incoming calls.

Mosquera-Candelo was added to the targets of the DEA investigation and indexed in the case initiation report. (Doc. 658 at 13:21-15:1 and 67:8-68:22.) A DEA Agent, Agent Timothy Fabre, testified that the DEA agents investigated Santos Mosquera-Candelo but were not able to corroborate the confidential source's statement that he was the source of the heroin supply.[2] (Doc. 658 at 45:20-46:12; 68:25-69:20.)

In the initial investigation into the Jason Muse drug-trafficking organization, Agent Fabre, explained that Jason Muse and his associates would use counter-surveillance measures that made the investigation difficult. Agent Fabre testified:

> We had tried to set up surveillance on his residence which would not work. We got videoed or we believed we were being videoed by an individual across the street. We had tried to follow him on numerous occasions just to see what he did throughout the day, which were not successful. We tried to install a pole camera on one of the businesses, we never got anything out of it. It was not beneficial whatsoever. We tried to exhaust -- we couldn't do trash pulls because of the cameras on his residence and the location, which is something that we try to do if we can. Just those techniques, individual stuff -- some of it the controlled buys worked, but that would only allow us to indict Mr. Muse and Mr. Elphage.

(Doc. 658 at 105:7-19.)

b. *Wiretap authorizations*

Starting in January 2016, federal authorities applied for wiretaps under 18 U.S.C. § 2518(1)(c) and (3)(c). (Doc. 543 at 1–2.)   At issue in this matter is the initial application from January 2016. The initial application described the following objectives:

---

[2] Agent Fabre testified at the *Franks* Hearing that the investigation of the statement that Santos Mosquera-Candelo was the source of the heroin supply stating:

> [Agent Fabre] We tried -- like I explained earlier, we asked the agents in Ascension if anybody had heard from him, seen him, if they had any other sources saying that he was possibly Jason Muse's source. The only two agents I believe that -- I mean detectives at that time that remembered him from back during the years that Agent Lusco was talking about was Agent Boe, Clint Boe and Will Rheams and they both said they hadn't heard from him in years.
> [AUSA] Did you go back and ask the CS-1 that was the basis of your report if he had ever heard of Santos Candelo-Mosquera?
> [Agent Fabre] Yes, ma'am. We asked him if he knew Santos or anybody by the name they called poppa that could be associated with Mr. Muse. He had never heard of that name either.

(658 at 69:3-16.)

determination of the extent and methods of operation of the drug trafficking organization, the identities of the target subjects (i.e. the one using the phone and the ones speaking to him/her), the receipt and distribution of drugs and money, the locations of money and records, the location of other resources used to finance the operation, and the location of proceeds.

(Doc. 596 at 1–2.) The wiretap application further stated that the supporting affidavit would show that "normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried or are too dangerous to employ." (*Id.* at 2.)

In support of the wiretap application, Agent Fabre provided an Affidavit in Support of Application ("Wiretap Affidavit"). (Ex. 17.) In the Wiretap Affidavit, Agent Fabre made the following statements: "During the investigation Jason Muse's source of supply has not been identified." (Ex. 17 at ¶ 5.) Agent Fabre further provided that the target subjects were: "Jason Muse, Darwin Elphage, A.K.A. Zero Elphage, Marshall Muse, Chester Muse, Charlotte Muse, Ronald Davis Brandon Bulot and Herman Jimmerson, A.K.A. Monster." (*Id.* at ¶ 7.)

(Doc. 658 at 39:11-20.) As to the objective for the wiretap, Agent Fabre stated in the Wiretap Affidavit:

In particular, it is expected that these wire and electronic communications will involve discussions of the target subjects and others yet unknown which will reveal the following: . . . The location and identity of source or sources of supply of heroin and the means, manner and methods by which the heroin is imported, transported and distributed; . . . and the precise nature and scope of these illegal activities, particularly the identity and roles of additional co-conspirators who are not yet identified.

(Ex. 17 at ¶ 18.) The Wiretap Affidavit does not mention Santos Mosquera-Candelo or the confidential source that identified him as Jason Muse's source of heroin supply. (Doc. 658 45:20-46:12.)

The Wiretap Affidavit details the investigative techniques that the DEA agents considered using or used prior to applying for a wiretap. The investigative techniques discussed include among others: (1) confidential sources; (2) controlled purchases; (3) physical

surveillance; (4) pole cameras; (5) undercover agents; (6) search warrants; (7) interviews with subjects or associates; (8) use of Grand Jury subpoenas; (9) trash pulls; (10) tracking devices on vehicles. (Ex. 17 at ¶ 77-109.) The Wiretap Affidavit explains what information was elicited by each technique or why that technique was not successful. (Ex. 17 at ¶ 77.) For example, it lists the confidential sources and explains the role they had in identifying the drug-trafficking organization and participating in controlled buys. (*Id.* at ¶ 78-80.) It further discusses that one confidential source is unable to participate in a direct buy from the source of supply or to expand his/her influence because of concerns that Jason Muse would grow suspicious and would terminate any contact with the confidential source. (*Id.* at 83.)

### c. *Information gained as a result of the wiretaps*

The wiretap applications were approved and as a result Defendant, Aron Winter Mosquera-Castro was identified as a member of the drug-trafficking organization. (Doc. 543 at 2.) Agent Fabre testified:

> Just a few days after we began interceptions we intercepted the Defendant over the line. So we knew we were intercepting what appeared to be or what sounded over the phone as a Columbian. Then we intercepted some messages between an unknown number and Mr. Muse about him calling Poppa. So that's when we had determined -- we knew Poppa -- Santos was a Columbian. That apparently his nickname was referred to as Poppa by Agent Lusco's CS. Also Agent Lusco knew him as Poppa. Once we were able to confirm that, then we began to believe that he was possibly Jason Muse's source of supply.

(Doc. 658 at 77:9-19.) Therefore, as a result of the wiretap interceptions, Defendant Aron Winter Mosquera-Castro was ultimately arrested and charged as one of the conspirators.

### d. *The Hearing*

The Court held a hearing on the *Motion* on September 30, 2019 at which Agent Fabre testified. After Defendant rested his case in chief, the Government reasserted its position that

Defendant had not met its burden to show that a *Franks* hearing was appropriate. (Doc. 658 at 61:20-62:3.)

Agent Fabre was questioned about the inconsistency between the case initiation report that listed Santos Mosquera-Candelo as Jason Muse's source of heroin supply and the statements in the Wiretap Affidavit that "During the investigation Jason Muse's source of supply has not been identified." (Ex. 17 at ¶ 5.) Agent Fabre explained that he did not include the information regarding Santos Mosquera-Candelo because he had no other information to corroborate that Santos Mosquera-Candelo was involved with the Jason Muse drug-trafficking organization.[3] (Doc. 658 at 59:14-60:20.) He testified that he did not list Santos Mosquera-Candelo because:

> Agent Lusco had no knowledge -- when I asked him if he even knew who Jason Muse was he had no knowledge of Jason Muse, didn't know anything about him. Agent Lusco had worked an investigation on Candelo back in -- and I don't want to be wrong on the date -- but I'll say back in the late '90s. They, according to him, what he told me, the investigation, Mr. Candelo made them on surveillance, disappeared into the wind. The case went cold. They didn't hear anything from him or about him and then he told me in around 2005, I believe, or some time in the mid 2000's, he heard that Candelo had got arrested trying to transport a kilo of cocaine

---

[3] Agent Fabre explained that he obtained the information regarding Santos Mosquera-Candelo the day after they started the investigation. Agent Fabre described:

> [Agent Fabre] After this initial debriefing the -- I believe this is on the 22nd, some time during that day, myself and Agent Abney met with Ascension Parish detectives and debriefed who we now refer to as CS-1 who was the basis of that initial report right there. The following day myself and Agent Abney were in his cubicle at our old office. We were just separated by partitions. Agent Lusco sat on the other side. It was not uncommon for us to have conversations back and forth across the wall. We were at Agent Abney 's desk because at the time I was very new in to the task force, new to the paperwork, so we were lining up and talking about if we were going to open a case or not. We hadn't determined if we were going to open a case. But then Agent Lusco heard us talking about the restaurant, Chicken and Waffles, which was Jason Muse's -- owned a restaurant. When he heard it he told us he had an informant, a CS, that he had debriefed several months prior. He told us that he had thought he had mentioned something about the Chicken and Waffles. He ended up referring back to his report of that CS debriefing. When he referred back to the report -- we never even got up. He read it to us from the other side of the wall, and it stated that -- it was, I believe, maybe the last paragraph of his -- it was like a five, six page report -- the last paragraph the CS stated that Jason Muse was selling heroin -- basically selling heroin in Ascension Parish and that his source was a gentleman Santos Candelo-Mosquera, a.k.a. Poppa.
>
> [AUSA] what did you do next?
>
> [Agent Fabre] We asked Mark -- Agent Lusco if he had ever heard of Jason Muse. He told us no, he had never come across that name prior to what his CS told him in the debriefing about Jason Muse because he was debriefing on a totally separate case.

(658 at 64:16-65:22.)

to Baton Rouge and he said to the last of his knowledge he believed he had got deported back to Columbia. So based -- his CS that he provided stated – I never spoke to that CS prior to the telephone interview -- stated that Mr. Poppa was his nickname and he knew – I believe he knew his first name, Santos, was his source. Agent Lusco had worked the investigation before. So I took what the CS said, that it was his source. We asked agents in Ascension, we asked other narcotics agents, we asked our CS-1 at the time if they knew -- ever heard of somebody named Poppa or Santos or Candelo and nobody -- the agents from Ascension said they haven't heard from him in years. It had been since back after Agent Lusco's investigation. Nobody had heard from him. That he hadn't been around. On the scale of narcotics' trafficking that Agent Lusco described that Mr. Candelo was doing at the time in the late '90s, it would be hard for him to be dealing in this area, dealing that large of quantities, and nobody hear about him. So I could not confirm that or validate that information to put it in my affidavit.

(Doc. 658 at 59:14-60:20.)

Further Agent Fabre explained that unlike the Wiretap Affidavit, in which he only included information he could corroborate, he included Santos Mosquera-Candelo in the case initiation index because:

That way if -- because Agent -- after Agent Lusco told us that he had never heard of Jason Muse but that he had heard of Mr. Candelo, he told us about his investigation into Mr. Candelo. Upon telling us that, but he said he had not heard or seen him or any word of him since mid 2000's. So I put him in here in case another agency, whether it be down in New Orleans or Houston, anybody else happen to be working him, they would pick up the phone and call. And the statement that was made was just a statement that Agent Lusco provided him during the debriefing, that he was the heroin source of supply for Mr. Muse.

 (Doc. 658 at 67:8-68:2.)

Agent Fabre also detailed that leaving Santos Mosquera-Candelo out of the Wiretap Affidavit was not helpful. He stated that he wished he could have included the information:

Because it shows -- it shows the court more due diligence in our investigation, plus having Mr. Candelo being a Columbian source of supply would have opened up, through our channels at DEA, more funding, more resources that would come available. When we can reach into another country we tend to get a bigger pool of financial aid to pull from to help us out, so it's not something I would want to withhold.

(Doc. 658 at 72:2-73:1.) In addition, Agent Fabre stated that including that information would have strengthened the wiretap application with the Court and with DEA. (*Id.*)

DISCUSSION

a.  *Parties' Arguments*

1.  Motion to Suppress (Doc. 508) and Response (Doc. 543)

Defendant's overarching argument is that by January 25, 2016, when the Government applied for the first wiretap, ordinary investigative techniques were working. Defendant argues that contrary to the affidavit in support of the wiretap application, the DEA investigative report from September 23, 2015, attached to the defendant's supplemental brief, identifies one of the targets of the investigation as "Santos Mosquera Candelo, Muse's heroin source of supply." (Doc. 596 at 3.) Therefore, Defendant maintains that because Mosquera-Castro's traffic stops, detention, property seizures, and custodial statements were all the product of wiretap information, all evidence either contained in or derived from the wiretaps should be suppressed pursuant to 18 U.S.C. § 2518(10)(a). (Doc. 508-1 at 12.)

Defendant explains that normal investigative techniques had already revealed the leadership of the organization, a trip by Jason Muse to Florida to retrieve cocaine, and arrest warrants for several members of the organization. (Doc. 508-1 at 8.) DEA Agents further knew Boudreaux's role as the money-launderer. (*Id.*) This evidence Defendant argues is contrary to the claim made in Wiretap Affidavit, which stated that the investigative techniques used to that point would not result in the "successful prosecution of" Jason Muse and his codefendants. (*Id.*)

Defendant also claims that statements in the Wiretap Affidavit regarding the Government's knowledge of the identities and roles of several members of the organization are "inconsistent with" the DEA reports and "other contemporaneous information." (Doc. 508-1 at 10.) Defendant therefore maintains that the inconsistencies and the "failure to include relevant

information which would show that the ordinary investigative techniques were working" entitle him to a *Franks* hearing and "further undercut the necessity of the wiretap." (*Id.*) Last, Defendant argues that the second two applications are essentially identical to the first application, "with added material from the wiretaps, and each incorporates by reference the first application." (*Id.* at 12.) Thus, he suggests that if the first application is defective, "each successive application fails as well." (*Id.*)

In response, the Government first argues that a *Franks* hearing is only warranted where the defendant makes a preliminary showing that a false statement was either "(1) deliberately or recklessly included in an affidavit submitted in support of a wiretap, and (2) material to the district court's finding of necessity." (Doc. 543 at 9.) The Government argues that the "inconsistencies" and omissions of relevant information cited by the defendant are not specifically explained, the defendant cannot point to *any* false or misleading statement, and thus has not met his burden to make a preliminary showing of the necessity for a *Franks* hearing. (*Id.*).

The Government next argues that Defendant's characterization that "four or five confidential informants and/or debriefed defendants put together the core of the case," noting that prior successful use of informants in the investigation of a large-scale drug conspiracy does not mean that a wiretap was not necessary. (*Id.* at 11-12.) The Government lists each investigative tactic previously used by the agents and how the affidavits explained that the tactics were inadequate. For example, controlled purchases were effective as evidence against Jason Muse and Darwin Elphage, "but revealed very little regarding storage locations for drugs and drug proceeds, sources of supply, the organization structure of the Muse [drug-trafficking organization], and the transportation methods used by the organization." (*Id.* at 13.) Similarly,

physical surveillance provided some information, but was limited by the fact that the defendants were "surveillance-conscious and aware of law enforcement surveillance." (*Id.* at 14–15.) The Government argues that the affidavits also provide specific, non-boilerplate reasons for the inadequacy of pole cameras, undercover agents, search warrants, interviews, subpoenas, trash searches, tracking devices, pen registers, police records, and mail cover requests. (*Id.* at 15–18.)

   2.   Supplemental Brief (Doc. 596) and Response (Docs. 597 and 603)

Mosquera-Castro argues in his supplemental brief that a *Franks* hearing is warranted because Defendant has shown that: (1) "a false statement knowingly and intentionally, or with reckless disregard of the truth, was included by the affiant in the warrant investigation;" (Doc. 596 at 9) and (2) "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." (*Id.* at 10).

Under the first prong, Defendant argues that Agent Fabre's statement, "During the investigation, Jason Muse's source of supply has not been identified" was either a knowingly false statement or made with reckless disregard of the truth. (*Id.* at 9.) Defendant asserts that the statement was false because, "When the statement was made, the DEA and Agent Fabre knew at least one source of supply and denied the knowledge." (Doc. 596 at 9.)

Defendant also argues that Agent Fabre's statement that "normal investigative techniques have been tried and failed or reasonably appear unlikely to succeed if tried or are too dangerous to employ" is a questionable representation. (*Id.*). Defendant asserts that a "plethora of information"[4] had been gathered in the first 90 days of the investigation and that the material

---

[4] Specifically Defendant claims that prior to the wiretap application was filed, normal investigative techniques the DEA was aware of: (1) Jason Muse's home and business address; (2) Jason Muse and his wife traveled to Florida to purchase kilogram quantities of cocaine; (3) Mosquera-Candelo was his source of supply; (4) property owned by Jason Muse used in narcotics transactions; (5) hand to hand transactions done on behalf of Jason Muse by Darwin Elphage; (6) direct recorded communications between Jason Muse and Darwin Elphage discussing narcotics and monetary transactions; and (7) Herman Jimerson's status as a narcotics dealer and his phone number. Defendant claims, normal investigative techniques after the application was approved revealed (1) a witness who saw kilo gram

facts were omitted or understated in the wiretap application with a reckless disregard for the truth. (Doc. 596 at 10.)

Under the second prong, Defendant argues that the goals of the wiretap application include "identifying the accomplices and suppliers, the roles of the players and the sources of supply." (*Id.*). As the identity of the supplier is material to the goals of the wiretap application, the Defendant argues that the statement that "Jason Muse's source of supply has not been identified" was material to granting the wiretap application (*Id.* at 9.). In sum, Defendant asserts that a *Franks* hearing is warranted because he has met the burden of showing each prong of the *Franks* test.

In the alternative, Defendant argues that the Government cannot prove that the wiretap was necessary as required under 18 U.S.C. § 2518(1)(c) and (3)(c) because of extent of the information gathered by normal investigative techniques. (*Id.* at 11.) Specifically, Defendant argues that because the Government was aware of one source of supply (Santos Mosquera-Candelo), Jason Muse's vehicles and property, other members' involvement (Marshall Muse, Boudreax, Darwin Elphage, and Herman Jimmerson III), had conducted controlled buys, and had learned information about the "movement of drugs and money within the organization by way of [confidential source] debriefings and recorded jail calls," the traditional investigative techniques employed to this point "were working, not failing." (Doc. 596 at 12).

The Government's response argues: (A) Defendant has not met "the substantial preliminary showing that a false statement was (1) deliberately or recklessly included in an affidavit submitted in support of a wiretap, and (2) material to the district court's finding of

_____

quantities of narcotics and firearms in Jason Muse's residence; (2) advised that Kevin Boudreaux accepts and launders proceeds from drug trafficking; and (3) confirmed that Jason Muse traveled to Florida using his sister's car in furtherance of narcotics trafficking. (Doc. 596 at 10-11.)

necessity" (Doc. 603 at 2); and (B) the wiretap interceptions were necessary to achieve the ultimate goal of the investigation (*Id.* at 4).

First, the Government argues the Government did not misrepresent any facts in any of the affidavits in support of the wiretaps. (*Id.* at 3). The Government argues it did not know that Santos Mosquera-Candelo was Muse's heroin supply because the information came from a confidential source and the Government "is entitled to, and should be expected to, make efforts to corroborate information provided by confidential sources." (*Id.*). Second, the Government argues that had a statement identifying Santos Mosquera-Candelo as the source of supply been included, it would not have been material to the finding of necessity because Santos Mosquera-Candelo was no longer the source of supply at the time of submission of the affidavits. (*Id.* at 4).

Regarding whether the wiretap interceptions were necessary, the Government argues that the presence of the investigative leads cited by Defendant does not eliminate necessity to "determine the contours and dimensions of the entire conspiracy and to develop sufficient evidence to prove each conspirator's guilt beyond a reasonable doubt." (*Id.* at 5.). The Government further argues that regardless of the leads from confidential sources, the wiretap was necessary for corroboration. (*Id.* at 6).

3. Reply (Doc. 607) and Surreply (Doc. 613)

Defendant's reply argues that he is entitled to a *Franks* hearing because the facial inconsistency between the DEA reports and the Wiretap Affidavit shows the false statement and that the false statement was material. (Doc. 607 at 2-3). Defendant's reply also argues that necessity is still at issue because ordinary investigative techniques were successful. (*Id.* at 4-5).

The Government's surreply argues that the Defendant's evidence does not meet the burden necessitating a *Franks* hearing and that the necessity argument urged by the Defendant

would amount to Monday morning quarterbacking regarding the investigative choices by the DEA. (Doc. 613 at 1-2).

4. Post-Hearing Memorandum (Doc. 660) and Response (Doc. 663)

Defendant argues in his post-hearing memorandum that it is not disputed that (1) the Wiretap Affidavit did not list Santos Mosquera-Candelo as a target subject or detail that he was the source of Jason Muse's heroin supply; and (2) a goal of the wiretap was to discover the source of supply. (Doc. 660 at 2.) Defendant maintains that Agent Fabre intentionally omitted Santos Mosquera-Candelo from the affidavit and that the explanation that it was left out because it was not corroborated was merely an excuse. (*Id.* at 3.)

Defendant asserts that intentionally omitting Santos Mosquera-Candelo deprived the judicial officer of the ability to evaluate the application as required under the Fourth Amendment. (*Id.* at 3.) Defendant cites *U.S. v. Johnson*, for the proposition that it is the judicial officer and not the law enforcement agency that should evaluate the parameters of the warrant application and make the decision that there is probable cause. (*Id.*) Specifically, Defendant points the Court to Justice Frankfurter's explanation that:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

(Doc. 660 at 3. (citing *Johnson v. United States*, 333 U.S. 10, 13–14 (1948)).)

Defendant focuses on the explanation of corroboration and details that, while DEA Agents were able to corroborate the confidential source's information about Jason Muse and Darwin Elphage, there was no corroborating evidence regarding the other target subjects. (*Id.* at 4.) Defendant points out that Agent Fabre's reliance on corroborating information from Ascension Parish is "a classic example of an echo chamber, the information from [the confidential source] given to Agent Fabre was corroborated by information given to the other agency by …. [the same confidential source]." (*Id.* at 5.) Defendant also points out that Agent Fabre declined to question the confidential source who supplied the information about Santos Mosquera-Candelo. (*Id.*) As such, Defendant argues that individuals were included in the Wiretap Affidavit that had not been corroborated with any greater certainty than the information on Santos Mosquera-Candelo. (*Id.* at 5.) Therefore, Defendant asserts that it was reckless to omit this information from the Wiretap Affidavit. (*Id.*)

Defendant also argues that the wiretap was not necessary because:

> In ninety days, the normal investigative techniques had yielded identities of 5-6 members of the drug trafficking organization, including Muses's source of supply, had yielded recorded conversations between Jason Muse and another member of the conspiracy discussing narcotics trafficking, had yielded the location of property in Jason Muses's name, and the cars used to make interstate purchases of kilogram quantities of cocaine. These are not failures of normal investigative techniques. They are success. To gain this much information within ninety days of beginning an investigation shows that normal investigative techniques were working, not failing.

(Doc. 660 at 6-7.) In conclusion, Defendant argues that the Wiretap Affidavit contained material misrepresentations and omissions that did not allow Judge Jackson the ability to act as a neutral judicial officer and therefore all information gained from the wiretap should be suppressed. (*Id.* at 7.)

In response, the Government argues that (1) Agent Fabre did not omit relevant information from the Wiretap Affidavit; (2) the alleged omission would have strengthened the wiretap application; (3) the wiretap was necessary to identify the full scope of the drug-trafficking organization. (Doc. 663 at 1-5.)

In support of the argument that the Wiretap Affidavit did not omit relevant information, the Government argues that the information linking Santos Mosquera-Candelo to the Jason Muse drug trafficking organization was distinctly different from the information contained in the Wiretap Affidavit. (*Id.* at 1.) Specifically, the Government points out that the information regarding Santos Mosquera-Candelo: (1) came up in a separate investigation; (2) was not corroborated by a separate source; and (3) dealt with an incarcerated and deported Colombian national. (*Id.* at 3-4.) Further, the Government states that the Wiretap Affidavit sets out that not every fact concerning the investigation is included. (*Id.* at 2.)

The Government also argues that had the information about Santos Mosquera-Candelo been included, it would have strengthened the Wiretap Affidavit and supported a finding of probable cause. (*Id.* at 4.) The Government emphasizes that "[i]nformation that the Muse drug-trafficking organization in Ascension Parish had a connection to a Columbian source of supply vastly broadens the scope and magnitude of the investigation and bolsters probable cause and necessity, not undermines it." (*Id.* at 5.)

Finally, the Government turns to whether the wiretap was necessary given the success of normal investigative techniques. (*Id.* at 5.) The Government cites a plethora of cases that hold that wiretaps can be necessary to develop the full scope of a conspiracy even when normal investigative techniques have led to evidence against one conspirator. (*Id.* at 6 (citing *United States v. Murdock*, 2010 U.S. Dist. LEXIS 138943 (S.D. Ga. Dec. 17, 2010) ("Agents who have developed 'mountains' of evidence against one coconspirator are nevertheless permitted to use a wiretap to determine the

contours and dimensions of the entire conspiracy and to develop sufficient evidence to prove each

conspirator's guilt beyond a reasonable doubt."); and *United States v. Olmedo*, 552 F. Supp. 2d 1347,

1365 (S.D. Fla. 2008) ("where conventional techniques will not show the entire scope of the

conspiracy, a wiretap is permissible, even in those situations where conventional techniques will

allow for the arrest and conviction of some members").) Further the Government, points the Court to

a Fifth Circuit decision, *United States v. Johnson*, which states

> the affidavit gave specific reasons why physical surveillance, trash pulls, and the
> use of cameras would risk compromising the investigation because of the
> geographic layout of the area and would be unlikely to provide information about
> the scope of the operation or [Defendant]'s supplier. Similarly, using the CS to make
> more purchases would pose dangers and would not likely produce information
> about other members of the operation or [Defendant]'s source.

*United States v. Johnson*, 393 F. App'x 240, 242 (5th Cir. 2010). Finally, the Government details

that the Fifth Circuit has repeatedly upheld wiretaps when "the United States sought to expand

its investigation into the full scope of a criminal enterprise, and traditional investigative

techniques, though productive of some evidence, could not reveal that scope." (Doc. 663 at 7

(*United States v. Butler*, 477 F. App'x 217, 220–21 (5th Cir. 2012).)

### b. *Applicable Law*

1. <u>Franks Standard</u>

"The bulwark of Fourth Amendment protection, of course, is the Warrant Clause,

requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested

magistrate before embarking upon a search." *Franks v. Delaware*, 438 U.S. 154, 164, 98 S. Ct.

2674, 2681, 57 L. Ed. 2d 667 (1978). The Amendment itself provides in relevant part that "no

warrant shall issue, but upon probable cause, supported by Oath or affirmation[.]" U.S. Const.

amend. IV. "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise

'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks*, 438

U.S. at 164–65, 98 S. Ct. at 2681 (quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005

(S.D.N.Y. 1966) (emphasis in original)). "Truthful" is meant "in the sense that the information

put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165, 98

S. Ct. at 2681.

*Franks* "set[s] out the legal principles that govern how courts are to address a defendant's

allegations of false statements in warrant affidavits[.]" *United States v. Looney*, 532 F.3d 392,

394 (5th Cir. 2008) (per curiam).  In *Franks*, the Supreme Court reversed the Supreme Court of

Delaware, which had held, that "a defendant under *no* circumstances may so challenge the

veracity of a sworn statement used by police to procure a search warrant."  438 U.S. at 155, 98 S.

Ct. at 2676 (emphasis in original).  The *Franks* court held:

> [W]here the defendant makes a substantial preliminary showing that a false
> statement knowingly and intentionally, or with reckless disregard for the truth, was
> included by the affiant in the warrant affidavit, and if the allegedly false statement
> is necessary to the finding of probable cause, the Fourth Amendment requires that
> a hearing be held at the defendant's request. In the event that at that hearing the
> allegation of perjury or reckless disregard is established by the defendant by a
> preponderance of the evidence, and, with the affidavit's false material set to one
> side, the affidavit's remaining content is insufficient to establish probable cause, the
> search warrant must be voided and the fruits of the search excluded to the same
> extent as if probable cause was lacking on the face of the affidavit.

*Id.*, 438 U.S. at 155–56, 98 S. Ct. at 2676; *see also Looney*, 532 F.3d at 394 (quoting *Franks*). At

the end of its opinion, the *Franks* Court "repeat[ed] with some embellishment" its holding from

the beginning of the opinion:

> There is, of course, a presumption of validity with respect to the affidavit supporting
> the search warrant. To mandate an evidentiary hearing, the challenger's attack must
> be more than conclusory and must be supported by more than a mere desire to cross-
> examine. There must be allegations of deliberate falsehood or of reckless disregard
> for the truth, and those allegations must be accompanied by an offer of proof. They
> should point out specifically the portion of the warrant affidavit that is claimed to
> be false; and they should be accompanied by a statement of supporting reasons.
> Affidavits or sworn or otherwise reliable statements of witnesses should be
> furnished, or their absence satisfactorily explained. Allegations of negligence or
> innocent mistake are insufficient. The deliberate falsity or reckless disregard whose

impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

*Franks*, 438 U.S. at 171–72, 98 S. Ct. at 2684–85 (footnote omitted).

Thus, the Fifth Circuit "will not uphold an officer's good faith reliance on a warrant if 'the issuing-judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." ' " *United States v. Gallegos*, 239 F. App'x 890, 894–95 (5th Cir. 2007) (quoting *United States v. Gibbs*, 421 F.3d 352, 358 (5th Cir. 2005)). "In evaluating this argument," the Fifth Circuit "appl[ies] the standard from *Franks* . . . , which requires a defendant to show that '(1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause.' " *Gallegos*, 239 F. App'x at 895 (quoting *Untied States v. Mays*, 466 F.3d 335, 343 (5th Cir. 2006)); *see also United States v. Cavazos*, 288 F.3d 706, 709–10 (5th Cir. 2002) (describing same *Franks* standard).

The Fifth Circuit has applied the *Franks* standard to alleged omissions. *See United States v. Tomblin,* 46 F.3d 1369, 1377 (5th Cir. 1995). The Fifth Circuit has stated that in "situations involving alleged omissions . . . [u]nless the defendant makes a strong preliminary showing that the affiant excluded critical information from the affidavit with the intent to mislead the magistrate, the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity." *United States v. Arispe*, 328 F. App'x 905, 907 (5th Cir. 2009) (internal quotations and citations omitted).

The *Franks* standard has also been applied by courts in reviewing the authorization of a wiretap. Specifically, the Fifth Circuit explained the applicability, stating:

> Although *Franks* dealt with warrants and our case involves a wiretap authorization under 18 U.S.C. § 2518, [w]here, as here, [an] affidavit falls squarely within the dictates of section 2518, application of the *Franks* standard is ... appropriate. A defendant seeking a *Franks* hearing must establish that material misstatements or omissions are contained in the supporting affidavit and that if those statements were excised (or the omitted information included), the affidavit would be insufficient to support the warrant (or, in this case, the wiretap authorization). Only then is an inquiry into the good faith of the affiant by way of a *Franks* hearing necessary to determine whether the information obtained should be suppressed.

*United States v. Signoretto*, 535 F. App'x 336, 339 (5th Cir. 2013) (internal quotations and citations omitted).

2.  Necessity under 18 U.S.C.§ 2518

An application for a wiretap authorization request requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This requirement is not intended to "foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir. 1984). "Rather, it requires a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *United States v. Torres*, 694 F. App'x 937, 943 (5th Cir. 2017) (internal quotation marks omitted).

Where a wiretap is needed to "expand [the] investigation into the full scope of a criminal enterprise, and traditional investigative techniques, through productive use of some evidence, could not reveal that scope," the wiretap authorization will be upheld. *United States v. Butler*, 477 F. App'x 217, 220–21 (5th Cir. 2012). "Rather than simply making generalized assertions about the difficulty of drug conspiracies generally, the affidavit in support of the application

must show with specificity why in *this particular investigation* ordinary means of investigation will fail." *United States v. Stoddard*, 892 F.3d 1203, 1212 (D.C. Cir. 2018) (internal quotation marks omitted and alterations included). However, the Fifth Circuit detailed that when determining if normal investigative techniques were successful,

> What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time. Here, the government's investigation began in 2005, but the government did not resort to applying for the wiretaps until two years later. At the pretrial conference, the district court opined that other investigatory techniques may have been less convenient or less confessional than a wiretap, but that doesn't make it a practical impossibility to get the information other than through the wiretap. To repeat, the statutory "necessity" requirement does not require the government to show that every other imaginable mode of investigation would be unsuccessful.

*Butler*, 477 F. App'x at 221 (citations and quotation marks omitted).

c.   *Analysis*

1.   Franks standard

In asking the Court to suppress the information gained from the wiretaps under the *Franks* standard, Defendant focuses on the statement in the Wiretap Affidavit that the Government did not know Jason Muse's source of heroin when Santos Mosquera-Candelo had been identified as a source in a DEA investigative report. (Doc. 660 at 1-2.) Thus, Defendant argues that Agent Fabre "knew at least one source of supply, and denied that knowledge, intentionally, or with reckless disregard for the truth." (Doc. 596 at 9.) The Government maintains that no relevant information was omitted intentionally or with reckless disregard for the truth because the information pertaining to Santos Mosquera-Candelo was uncorroborated. (Doc. 663 at 1.)

The Court agrees with the Government that Agent Fabre did not omit the information regarding Santos Mosquera-Candelo with reckless disregard for the truth. In the hearing, the

Court found Agent Fabre to be a credible witness. His testimony established that the reliability of the information on Santos Mosquera-Candelo was different from the other target subjects in the Wiretap Affidavit. Despite Defendant's arguments to the contrary, the DEA agents' efforts to corroborate the Santos Mosquera-Candelo information were reasonable given that: (1) the information arose in a separate investigation that was 3-6 months old; (2) no other narcotics agents in the community had heard about Santos Mosquera-Candelo in years; and (3) Santos Mosquera-Candelo had been arrested and deported. Because of these differences, Agent Fabre's decision to omit the information regarding Santos Mosquera-Candelo was not done with reckless disregard for the truth.

Even if the Court were to hold otherwise, Defendant has also failed to show that the omitted information was material to the issuance of the wiretap. To demonstrate that a misstatement was material, Defendant must show that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156. Again, the Court agrees with the Government that the information that a Colombian national was the source of heroin supply for a drug-trafficking organization in Ascension Parish would have supported—not detracted from—a finding of probable cause to determine the full scope of the conspiracy.

Defendant has failed to show that the Wiretap Affidavit contained that a false statement made knowingly and intentionally, or with reckless disregard for the truth, or an omission of critical information from the affidavit with the intent to mislead. Further, Defendant has failed to show that the information regarding Santos Mosquera-Candelo would not have led to a finding of probable cause. Therefore, because Defendant's arguments fail to meet either prong of the

*Franks* standard the Court holds that Defendant failed to make the substantial preliminary showing to entitle him to a *Franks* hearing and denies the *Motion to Suppress*.

2. Necessity

Defendant further argues that the Court should find that the wiretap was not necessary as required by 18 U.S.C. § 2518 because normal investigative techniques were successful in the first 90 days of the investigation at revealing information about the drug-trafficking organization. The Government argues that the Wiretap Affidavit shows how normal investigative techniques had worked, what information had been gained and why those techniques were not sufficient to elicit the full scope of the drug-trafficking organization. The Court agrees with the Government.

The Fifth Circuit regularly upholds "wiretap orders . . . involving investigations into large criminal conspiracies." *Torres*, 694 F. App'x at 944. For example, in *United States v. Krout*, the Fifth Circuit found that the affidavits at issue "contained detailed accounts of the investigative techniques" and revealed that "informants and undercover agents could not infiltrate the conspiracy at high enough levels to obtain sufficient evidence to prosecute managers of the organization." 66 F.3d 1420, 1425 (5th Cir. 1995). In this case, Agent Fabre explained in the Wiretap Affidavit that, while they used confidential sources, they could not infiltrate the organization at high levels and the sources were unable to learn about the organization's source of supply and money laundering activities.

In *United States v. Webster*, the Fifth Circuit upheld a wiretap authorization because traditional surveillance had not revealed the suspect's drug source, further surveillance risked detection, and infiltration was "not a viable option" because the organization was suspicious of strangers and because informants would not introduce an undercover agent to the leader. 734 F.2d 1048, 1054–55 (5th Cir. 1984). Here, as detailed in the Wiretap Affidavit, traditional investigative methods did not reveal the source of the organization's drugs or the complete

organizational structure. Additionally, the Wiretap Affidavit sets out that surveillance was risky because the members of the Jason Muse drug-trafficking organization used counter-surveillance to avoid detection from law enforcement and actively tracked the presence of unknown vehicles and individuals.  Further, the Wiretap Affidavit sets out that suspicion of newcomers would make it extremely difficult to introduce an undercover agent into the organization.

The Court follows the well-established case law in the Fifth Circuit upholding the necessity of a wiretap to achieve the goal of dismantling a large drug-trafficking operation like Jason Muse's. The many challenges posed by normal investigative techniques set out in the Wiretap Affidavit are legitimate justifications for the necessity of a wiretap. It is not reasonable to conclude that because certain investigative techniques were "working," a wiretap was not necessary for a full and complete investigation to dismantle the drug-trafficking organization. The Court therefore denies the *Motion to Suppress*.

<u>CONCLUSION</u>

**IT IS ORDERED** that Defendant's *Motion to Suppress* (Doc. 508) is **DENIED**.

Signed in Baton Rouge, Louisiana, on January 16, 2020.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**